David Kamerman and Martha Kamerman, et al., [1] v. Commissioner. Kamerman v. Commissioner
Docket Nos. 3370-65, 6271-66, 3256-67, 3283-67, 3301-67, 3104-68, 3577-69.
United States Tax Court
T.C. Memo 1972-120; 1972 Tax Ct. Memo LEXIS 137; 31 T.C.M. (CCH) 480; T.C.M. (RIA) 72120; May 23, 1972, Filed. Tried in New York, New York. Jerome Kamerman, 500 5th Ave., New York, N. Y., for the petitioners. Patrick E. Whelan and Edward H. Hance, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: Respondent *138 determined deficiencies in Federal income taxes and additions to tax in the following amounts: David Kamerman and Martha
Kamerman
Additions to Tax
Docket
Sec. 6653(a)
Sec. 6653(b)
Nos.
Year
Deficiency
I.R.C. of 1954
I.R.C. of 1954
3370-65
1958
$ 1,312.83
1959
3,107.24
1960
15,576.00
1961
233,652.59
6271-66
1962
17,030.25
3301-67
1963
68,162.03
$3,408.10
3104-68
1964
44,287.71
3577-69
1965
44,567.60
$22,283.80
Jerome Kamerman and Ruth Kamerman
Additions to Tax
Docket
Sec. 6653(a)
No.
Year
Deficiency
I.R.C. of 1954
3256-67
1963
$11,889.86
$ 594.49 Estate of Nadia Kamenka, Deceased, Hippolyte Kamenka,
Executor, and Hippolyte Kamenka, Surviving Husband
Docket
No.
Year
Deficiency
3283-67
1963
$ 3,046.90
Many of the issues have been conceded by the parties and effect to such concessions will be given in the Rule 50 computation. Respondent has also conceded on brief that the petitioners in Docket No. 3301-67 (David Kamerman and Martha Kamerman) are entitled to a deduction in 1963 attributable to a net operating loss incurred *139 by Magni-Flood Electric Products Co., Inc., a small business corporation under Subchapter S of the Internal Revenue Code of 1954. In his concession, however, respondent limits the amount of the loss available to petitioners to $50,070, which amount represents the petitioners' adjusted basis in the corporation under the provisions of sections 1374(c)(2) and 1376(b) of the Internal Revenue Code of 1954. [2] In their brief, the petitioners acknowledge the statutory limitation upon 482 the amount of the deductible loss in 1963 and the parties are thus in agreement as to this issue. The remaining issues are (1) whether certain payments made to the law firm of Kamerman and Kamerman represented additional taxable income in 1963 and 1964 to the firm's equal partners (David and Jerome Kamerman) or whether such payments represented amounts held in escrow for a client; (2) whether the amount of $15,000 received by petitioner Hippolyte Kamenka in 1963 from Manufacturers Credit Corporation in connection with the assignment to the corporation of the so-called Dorgi contract was taxable *140 to Kamenka as capital gain or as ordinary income; and (3) whether petitioners in Docket No. 3301-67 and Docket No. 3256-67 are liable for additions to tax under section 6653(a) for the taxable year 1963. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. David and Martha Kamerman, husband and wife, were residents of New York, New York, at the time their petitions herein were filed. Their joint Federal income tax returns for the years 1958 through 1965 were filed with the district director of internal revenue, Manhattan District, New York. Jerome and Ruth Kamerman, husband and wife, were residents of Manaroneck, New York, at the time their petition herein was filed. Their joint Federal income tax return for the year 1963 was filed with the district director of internal revenue, Manhattan District, New York. Hippolyte Kamenka was a resident of New York, New York, at the time his petition herein was filed (in his capacity as executor of the Estate of Nadia Kamenka and individually). The joint Federal income tax return of Nadia Kamenka, deceased, and Hippolyte Kamenka for the year 1963 was filed with the district director of internal *141 revenue, Manhattan District, New York. During the years 1963 and 1964, David and Jerome Kamerman were partners in the law firm of Kamerman and Kamerman. Each partner was entitled to one-half of the profits of the partnership in its fiscal years ended July 31, 1963, and July 31, 1964. David is a certified public accountant as well as an attorney and his experience in Federal tax matters is extensive. During the years 1957 through 1961, David represented Peter R. Matthews on various Federal tax matters. In 1962 Matthews, who was then president of the Matthews Industrial Piping Corporation, discussed with David the possibility of a compromise offer in connection with a substantial Federal tax liability of the Matthews Industrial Piping Corporation. Upon consideration of the financial condition of the corporation, David suggested a compromise offer of approximately $25,000 in cash. Matthews agreed to make a compromise offer in that amount but indicated he was financially unable to produce the whole amount immediately. Consequently, he agreed to make payments to David ranging from $500 to $1,000 a week until the full amount was collected, at which time the compromise offer would be *142 made by David's law firm. Beginning some time in 1962, Matthews made weekly payments of $500 to $1,000 to David, which amounts were held by David in escrow. On several occasions, however, Matthews demanded a return of portions of these amounts in order to meet certain current obligations. At the end of 1963 David had accumulated only about $5,000 toward the total amount to be offered in compromise. Some time in 1964 Matthews demanded the return of the balance held in escrow by David who complied with the request. Respondent determined that the payments by Matthews represented fees of the law firm which would be includable in the income of David and Jerome Kamerman in 1963 to the extent of $11,000 each. Respondent also determined that the payments by Matthews represented fees includable in the income of David Kamerman in 1964 to the extent of $2,500. In 1958 Dorgi Corporation was organized for the purpose of acquiring options o0 land to develop a housing project under the auspices of the City of New York. The stockholders of the corporation were Hippolyte and Nadia Kamenka, Samuel Brouner, David Kamerman, Jerome Kamerman, Morton Kamerman and Irwin Kamerman. By January 1959, the *143 Dorgi Corporation had acquired an option on a building site which was approved by the City of New York for a limited profit housing project pursuant to the provisions of Article XII of the Public Housing Law (also known as the Mitchell-Lama Law). Hippolyte Kamenka, a registered architect in the State of New York since 1940, had been instrumental in finding the building site and preparing the preliminary plan which was subsequently approved by the appropriate city agency. 483 On February 20, 1959, the Dorgi Corporation entered into a contract with Vermilya-Brown Company, Incorporated, a corporation engaged in the construction business. The contract designated Vermilya-Brown as the general contractor for the housing project, contained a schedule of payments which would constitute payment in full to Vermilya-Brown for the construction of the project and, finally, provided that the "balance of the monies received by VERMILA-BROWN from the office of the Comptroller of the City of New York and from any cooperative corporation organized to own The Project, shall be paid over to DORGI, as and for DORGI'S fee for its services rendered as originator, sponsor and developer of The Project. *144 " On March 17, 1959 the stockholders of the Dorgi Corporation resolved to assign the contract between Vermilya-Brown and the Dorgi Corporation (hereinafter the Dorgi Contract) to David Kamerman and Hippolyte Kamenka for services rendered. Kamenka and David Kamerman each received a one-half interest in the Dorgi Contract under the assignment. Subsequent to the assignment, Kamenka continued to work on plans for the project. The actual construction of the housing project was performed by a corporation (Adee Tower Apartments) which was formed for that purpose. On December 24, 1959, the Dorgi Contract was transferred to Manufacturers Credit Corporation, which corporation agreed to pay the transferrers a total of $160,000 over a period of three years. In a letter dated May 13, 1960, from Dorgi Corporation to Manufacturers Credit Corporation confirming the arrangements made for the collection of the amounts due from Vermily-Brown under the Dorgi Contract, it was stated that "[it] is understood that this contract is assigned to your corporation for collection purposes only and that you are to retain six (6%) percent of all sums collected by you under said contract and to remit the remainder *145 of such collections to * * * Kamerman * * * who has been designated by us as our agent to receive the above monies on our behalf." As of October 30, 1963, Vermily-Brown had made payments to Manufacturers Credit Corporation in the total amount of $164,359.79 on account of the Dorgi Contract and there was a claimed balance due under the contract as of that date in the amount of $49,095.84. On or about January 20, 1964, Manufacturers Credit Corporation assigned the Dorgi Contract to Matador Corporation (a corporation controlled by David Kamerman) for $5,501. Manufacturers Credit Corporation made the following payments to David Kamerman on account of the Dorgi Contract: $30,000 in 1960, $100,000 in 1961 and $30,000 in 1963. David Kamerman remitted one-half of the amounts he received in each of the years to Hippolyte Kamenka. Neither David Kamerman nor Hippolyte Kamenka reported in their respective Federal income tax returns for 1963 the $15,000 each of them received on account of the Dorgi Contract. Respondent in his statutory notice of deficiency in Docket No. 3283-67 determined that the payments of $15,000 received by Hippolyte Kamenka in 1963 on account of the Dorgi Contract were *146 taxable to him as ordinary income. Respondent also determined in the statutory notice of deficiency in Docket N0. 3301-67 that the payments of $15,000 received by David Kamerman in 1963 on account of the Dorgi Contract were similarly taxable to him as ordinary income. Opinion The first issue is whether the installment payments made by Peter R. Matthews to David Kamerman in 1962 and 1963 of $24,500 represented income of the law firm Kamerman and Kamerman in its fiscal years ended July 31, 1963, and July 31, 1964, and therefore taxable to David and Jerome Kamerman in the amounts determined by respondent. Essentially, the resolution of this issue turns upon the credibility of the two witnesses, David Kamerman and Peter R. Matthews, whose versions of the transaction are diametrically opposed. As our findings of fact indicate, we have accepted the version of David Kamerman, i.e., that the payments were to be used by the Kamerman law firm in reaching some settlement with the Internal Revenue Service of Matthews' outstanding Federal tax liabilities and that, due to Matthews' need for funds, the amounts held by the law firm were returned to Matthews in varying amounts and eventually, at *147 some time in 1964, the law firm had returned to Matthews all of his payments. We have difficulty accepting Matthews' testimony that the funds were not returned to him by the law firm after the contemplated negotiations with the Internal Revenue Service never materialized. Matthews himself testified at one point that the payments to the law firm were not intended 484 as a fee. Consequently, it is inconceivable that the law firm would simply refuse to return these escrow funds. It is even more inconceivable that Matthews would be content with nothing more than a few desultory attempts from time to time over a period of two years (according to his testimony) to get his money back from the Kamerman law firm. From February 1963 through March 1964, a series of cash deposits were made to the bank account of Matthews' corporation with indications that at least some of this money came from Matthews individually. The total cash deposits made in this manner were $24,500 and both the dates and the amounts of the individual deposits appear to lend support to David Kamerman's testimony that from time to time during this period he returned some of the escrow funds to Matthews who was continually *148 in need of funds to meet current obligations. We hold that the payments made by Matthews to the Kamerman law firm during the period here involved did not constitute taxable income to David Kamerman or Jerome Kamerman during the taxable years 1963 and 1964. The next issue is whether the amount of $15,000 received by petitioner Hippolyte Kamenka (Docket No. 3283-67) in 1963 in connection with the so-called Dorgi Contract is taxable as ordinary income. [3] Kamenka did not report this payment to him in his Federal income tax return for 1963. His argument now is that the payment represents a portion of the proceeds realized from the sale of the Dorgi Contract to Manufacturers Credit Corporation and is therefore taxable as a long-term capital gain. There is no merit in this contention. In January 1959, the *149 Dorgi Corporation had acquired an option on a building site for a housing project. Kamenka, an architect and one of the stockholders in Dorgi Corporation, had located the site and had prepared the preliminary plans which were subsequently approved by the City of New York. David Kamerman had agreed to participate in the project together with Kamenka and the Dorgi Corporation had been formed for that purpose. In February 1959, the Dorgi Corporation entered into a contract (the so-called Dorgi Contract) designating Vermilya-Brown as the general contractor and specifying the fee to be paid to the Dorgi Corporation for its services rendered. The contract was assigned to Hippolyte Kamenka and David Kamerman for services rendered and it is clear that compensation for such services would be taxable as ordinary income under section 61. The transfer of the Dorgi Contract to a third party (Manufacturers Credit Corporation) which undertook to collect the amounts due from Vermilya-Brown and transmit them to Kamenka and Kamerman does not change the character of income received from ordinary income to capital gain. The evidence shows that the contract was assigned to the third party for collection *150 purposes only, with the understanding that the third party would retain as its fee six percent of the amounts collected. [4] Consequently, without the requisite sale or exchange of a capital asset, the payments received by Kamenka in 1963 cannot qualify as capital gains under sections 1221 and 1222. Even if it is assumed that the transfer of the Dorgi Contract to the third party was in fact an assignment, the result would be the same. It is well established that payments received from the anticipatory assignment of contracts involving services either performed or yet to be performed are taxable as ordinary *151 income. Glenn E. Alexander, 34 T.C. 758; United States v. Eidson, (C.A. 5) 310 F. 2d 111; Pridemark, Inc., 42 T.C. 510, affd. on this issue, (C.A. 4) 345 F. 2d 35. We hold that the payment of $15,000 received by Hippolyte Kamenka in 1963 in connection with the Dorgi Contract is taxable as ordinary income. Respondent determined in Docket No. 3301-67 (David and Martha Kamerman) and 485 in Docket No. 3256-67 (Jerome and Ruth Kamerman) that the petitioners therein were liable for additions to tax for the years 1963 under section 6653(a) for negligence or intentional disregard of rules and regulations. With respect to David and Martha Kamerman, the respondent bases his determination upon their failure to report (1) the receipt of $15,000 in connection with the Dorgi Contract and (2) the receipt of fee income from Peter R. Matthews in the amount of $11,000. With respect to Jerome and Ruth Kamerman, the respondent bases his determination solely upon their failure to report $11,000 as fee income received from Peter R. Matthews. Since we have held that the payments made by Matthews to the Kamerman law firm did not constitute income *152 taxable to the law partners either in 1963 or 1964, there is no basis in the record for sustaining respondent's asserted additions to tax under section 6653(a) with respect to Jerome and Ruth Kamerman in the year 1963. As to David and Martha Kamerman, however, there remains the failure to report in their joint Federal income tax return for 1963 the receipt of $15,000 in connection with the Dorgi Contract. The burden of proof on this issue is upon the petitioners. David Kamerman is both an attorney and a certified public accountant with extensive tax experience. There is no indication that the petitioner in good faith believed that the omitted item represented a substantial issue of law or fact apart from its possible characterization as capital gains rather than ordinary income. See Tatem Wofford, 5 T.C. 1152. The record contains no convincing explanation for petitioners' failure to report this income. Therefore, we sustain the respondent's determination that the petitioners David and Martha Kamerman are liable for additions to tax under section 6653(a) for the taxable year 1963. Decision will be entered under Rule 50. Footnotes
1. Cases of the following petitioners have been consolidated herewith: JEROME KAMERMAN and RUTH KAMERMAN, Docket No. 3256-67; and ESTATE OF NADIA KAMENKA, DECEASED, HIPPOLYTE KAMENKA, EXECUTOR, and HIPPOLYTE KAMENKA, SURVIVING HUSBAND, Docket No. 3283-67.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
3. David Kamerman also received $15,000 in 1963 as his share of the payments under the Dorgi Contract. Petitioners in Docket No. 3301-67 (David and Martha Kamerman) have conceded in a supplemental stipulation filed after the trial of this case that the amount of $15,000 received by them in 1963 with respect to the Dorgi Contract is taxable as ordinary income in the year 1963.↩
4. As of October 30, 1963, Manufacturers Credit Corporation had collected a total of $164,359.79 from Vermilya-Brown on account of the Dorgi Contract and paid $160,000 to David Kamerman (who shared the payments with Kamenka). Early in 1964, Manufacturers Credit Corporation assigned the Dorgi Contract to a corporation controlled by David Kamerman for $5,501. Thus the total amount received by Manufacturers Credit Corporation in connection with the Dorgi Contract was $9,860.79 ($4,359.79 plus $5,501), or almost exactly six percent of the $164,359.79 collected from Vermilya-Brown.↩